Good morning. May it please the Court, John Pang on behalf of the Petitioner Ramon Matute. Petitioner's suppression claims, for which he seeks only an evidentiary hearing, center on DHS's deception and NIDOC's violation of its state detention power. When viewed in a light most favorable to Petitioner, six facts supply a basis for a hearing. First, the NIDOC's officers who commanded and held Mr. Matute for the interview had no authority to enforce federal immigration laws, and they had no premise for suspecting Petitioner had engaged in illicit activities. Second, the DHS officer, dressed in plain clothes, never identified herself as an immigration officer. With three NIDOC's officers standing in the interview room, Petitioner reasonably believed he was participating in a mandatory corrections interview, subject to the punishments that come from disobeying a NIDOC's officer's did not issue an immigration detainer or an administrative arrest warrant, both of which would have required her, under the federal regulations, to advise Petitioner that he had the right to an attorney, and his statements could be used against him. Fourth, the DHS officer did not use an interpreter, forcing Petitioner to participate in a language he barely understood. Fifth, the DHS officer The questions and answers, though, especially the question and answer that's at issue here about his status, was translated into Spanish on the document right under the English, correct? That's correct. So how do we have an egregious violation, which is the standard here, in admitting that statement? He's got, he, he, there's no question that he understood that, right? I don't think it's clear, and if we don't, it's in Spanish on the document. Because as Mr. Matute alleged, he was only given the signature page, and he signed the signature page. But his initials are on every page. I understood, Your Honor, but, but I think. So does he say that he did, somebody else initialed it on his behalf? Is that the claim? No. I believe a reasonable inference is that Mr. Matute was told, sign here, initial here, just like you would maybe a standard So he was given every page. He just, and he signed every, he initialed every page. You're saying he didn't look at what he was initialing? Yeah, I think that's maybe. So it's not right that he only got the signature page. He got every page. It's just you're saying he didn't look at what was written on it. I don't think that's maybe fully clear, but, but yes, it's, the only allegations is on the signature. So if the page was in front of him and all the questions were in Spanish, then he did have the opportunity to understand what it said, right? I suppose, yes. Can I ask, you know, so before we get even into, you know, all of these merits questions, can I just ask about the significance of the affidavit? And so the affidavit is introduced just to prove alienage, that he's from Honduras and doesn't have legal status in the United States, right? Correct. Now in the very same proceedings, Mr. Matute submitted an I-589 that says he's a Honduran national and doesn't have legal status. Was he being truthful on the 589? Well, Your Honor, the board, and then also I think this court has affirmed that when there's a suppression issue that comes up, any subsequent filings in kind of a defensive posture against removal cannot be held against the person. That was true in Milan-Hernandez. Same situation occurs. So you're saying he only did, he only submitted the 589 because they were going to remove him anyway? Correct. Correct. But what the 589 shows is he does not dispute that he is a Honduran national without legal status in the United States, right? But I think in removal proceedings, the government has the initial burden of establishing. I mean, they have an initial burden, but usually that's established with very slight evidence. The government can just search its databases and say it appears to us that he doesn't have legal status, then it's up to him to say that he does, right? Well, Your Honor, I think it's notable here that the government didn't do those things. In all the other cases this court has addressed, Milan-Hernandez, Zuniga-Perez, there was an I-213, which is what Your Honor, I think, is describing, where there is a database where there's other proof that could call this into question. Here, the only proof is this interview, and I think that's why the focus. Where's the egregious conduct? I mean, there's no indication of threats or use of force or racially motivated conduct. I mean, what is the basis for the assertion that there's egregious conduct? Well, Your Honor, here I think the standard here is only could there be a basis for finding of egregious conduct. I'm not quite sure where that... What is the possible basis for egregious conduct? And so turning to maybe Quotzahayi, which this Court looked at, the standards, the factors for looking at egregiousness, we look at factors in the Fourth Amendment context, including whether there's even a basis for stopping and seizing this person. I don't think there's any... He was in prison, so it's not your typical situation where someone is out on bail. There were two other guys online who were pulled out. Correct. Do we know anything about the other two guys? Did they pull out three Hispanic guys? Not as a ledger. Right. So there doesn't seem to be any indication that race was a motivating factor. So I'm trying to... What is the egregious conduct or the possible egregious conduct here? So I think for me, the starting point is the state officer's conduct. So this Court said in Milan-Hernandez, state officers have no authority to enforce federal immigration law. But he wasn't enforcing federal immigration law, right? I mean, state officers can ask about immigration status, right? We've said if somebody's lawfully detained, or the Supreme Court maybe has said that if somebody's lawfully detained, you can ask questions about their status. I don't believe there is a precedent saying that, that a state officer would be able to do that. Right, but you've got the burden to show that this would have been egregious to do this, and you don't have any authority to show that this would have been egregious, correct? Well, I think a basis for egregious, and I think I would go back to the Kotzeheim factor. What's egregious? I mean, just you giving the word it's everyday meaning, what is egregious about a state official acting as they did in this circumstance? I think it goes to the initial point of saying state officials have no authority to enforce federal immigration laws. But again, he was not enforcing federal immigration laws, right? The state can cooperate with the federal government. You're saying, is the state prohibited from cooperating with the federal government? No, there has to be. Okay, so here the state official says, I'm going to take you to this place where a federal officer is going to ask you some questions. That's why I pointed out the lacking detainer. Usually when that cooperation happens. But we have a statute, right, that says that immigration officers without warrants can interrogate any alien or person believed to be an alien as to his right to be a German in the United States. He doesn't need a warrant in order to ask those questions, does he? The immigration official, no, but that regulation also... He's also in prison, so they don't need a detainer because he's already detained. Well, I think that the detainer is speaking to whether there's a reasonable suspicion of alienation. So an immigration official cannot just stop anyone on the street and ask them for their immigration status. I think that was clear in the law. So you're saying that it could be egregious if a corrections officer just randomly pulls out prisoners to be interviewed by an immigration authority. You think that could be egregious conduct, even if it's in the context of a prison? I think it's a combination of all of it. What else is there? Right, so again, on the state asking them for their status. This was them picking out three people and then providing them with... It's a random selection of people to be questioned. And that may be, and I think why the evidentiary hearing is important because in the other cases, like in Milan-Hernandez, there was a police report that provided an alternative basis or alternative reason for the stop. Here we have nothing to go off of other than the allegations which we take as true. But which way does that cut? They picked out three people. So we're just saying there is no reasonable suspicion. But they picked out three specific people. They didn't just ask everybody. So that allegation doesn't show that it's more suspicious than another scenario, does it? I think it does because in the other scenarios, there's first a proper use of state authority. So in Milan-Hernandez, it was a traffic stop. In Zuniga-Perez, it was a state arrest warrant. And then the events developed such that the state official or the CBP officers want to ascertain to someone's immigration status. So in Mueller versus Mina, didn't the Supreme Court say that if somebody's detained and there's a lawful search, they can ask about the immigration status and they don't need reasonable suspicion specifically about that? Well, I think based off of this court's precedence, though, you first look at the state officials. And I don't think the state officials have the authority to enforce the federal immigration laws and to even bring Mr. Mathute into this situation. Let me ask you this. He's in state custody. How is he going to get from his cell or wherever he is to the room where immigration authorities want to speak to him? He'd be brought by the state corrections officers. Why isn't that the same as bringing the prisoner to any event that requires his transport within the prison? It doesn't have anything to do with enforcing immigration laws. The immigration authorities came to the prison, asked to interview someone, and they went and got him. All they did was transport him. I mean, in terms of recognizing this as egregious conduct, I'm having a little trouble with what you think the state officials did that would qualify as egregious. Is it your position they should have said to the immigration authorities, no, we won't produce him for you? Right. I think three... The answer is yes, that's what they should have done? Without even to tailor, yes. I would provide three responses here, Your Honor. So first... And what's your basis for saying that when immigration authorities asked to interview a prisoner that it would be egregious for state officials to say, no, we won't produce him? Well, I think it goes to the clear statement from Arizona versus United States where the Supreme Court saying that state officials cannot enforce immigration laws, federal immigration laws. Why is it enforcement of immigration laws? All they're going to do is transport him from one place in the prison to the others. Once the immigration authorities say whatever they're going to say to the fellow, he can say, I don't want to speak to you and ask to be brought back to his cell. So, Your Honor, if I could provide three reasons. So first is under typical corrections operations. So if I were to visit a correctional facility and I submit my legal visit request, I'm personally vetted. And then the person who I'm meeting with is asked, do you want to meet with this attorney, John Pang, who showed up for a legal visit? There was no identification that this was an immigration officer that wishes to meet... So would your view be if IRS officials showed up and asked to speak to a prisoner or if officials from the Justice Department showed up and asked to speak to a prisoner, that for the prison authorities to transport the person to that room would be improper? I think if they follow the basic steps of first vetting the person who's requesting, second, telling the inmate who it is that seeks to meet... What's your basis that that's required, that prison officials have to do that? Just under my understanding of the typical corrections operations and regulations, Your Honor, I don't have a specific... But nothing that says... It would be a seizure that would violate the Fourth Amendment if they didn't do these things that you're describing? Well, so maybe turning to the second reason, here, what about that? You're saying if you don't follow these steps of vetting the person and clarifying all these things, then you've I would say yes, Your Honor, because there is no valid basis. There is no reasonable suspicion of illicit activity. Yes, we say probably inmates have a reduced sense of privacy in this... So when you say, I want you to come talk to this lawyer, you've seized the person, even though he's incarcerated already. Yes, in the sense that under the typical assessment of a Fourth Amendment claim, I think yes, unless you have a valid reason for operating in that fashion. And typically, the corrections officers do follow their own regulations to provide that information. Now, the second reason I think that type of an interaction, Judge Raji, that you're mentioning is problematic, is here we also have three NIDOX officers standing in the interview room with the DHS officer not identifying herself. So there really wasn't a way for Mr. Mathieu to maybe realize this is an outside person coming to speak with me. This is something not part of the regular operations of prison interaction. When he was presented with the... Was he presented with the affidavit at the time, right? Wasn't it apparent that this was an immigration matter? By the end of it, Mr. Mathieu said he eventually understood that this was an immigration matter. Now, I think the other point I'd touch on that is... So by the time he signs this document, he understands that it's an immigration matter? I don't think it's clear from the allegations. This happened at the end, right? Yes, it happened at the end. All the questions are in Spanish, and it says U.S. Department of Homeland Security, and all the questions are about immigration. Yes. Your Honor, just maybe another brief point about the signature and the initials. Mr. Mathieu also alleges that he was lied to by the DHS officer to sign and initial the form. That is, the DHS officer told him, you have to sign this form in order to meet with a legal... Some of the answers clearly come from him. The last answer is, I want to stay in the United States and be with my family. I am scared to return to Honduras because of gangs. I mean, he certainly had some input into what was put into the affidavit, which he then signed. So the understanding from the allegations is this was all verbal. The officer asked Mr. Mathieu these questions. We don't know if it's exactly word for word from the affidavit. If the officer were just doing whatever the officer wanted and not him, it would not reflect those answers. I mean, the other question is, do you understand all the questions? And it says not all, right? If you're just trying to make a solid affidavit, you'd want it to say that he understood all the questions. But that seems like it's his answer, doesn't it? Well, Your Honor, that's for us to accept everything that's true from the affidavit, right? We're at a point now where we have an officer who is supposed to... I'm just saying that if you were going to lie to him and put answers that you preferred, it would not be answers that suggest that he did not understand all the questions. I think that may be true. You know, an officer, I think, could write a number of things there based off of their understanding of the interaction. I don't think I'm ascribing malintent for the DHS officer. She probably was doing just her job of getting down the answers that were being provided. But I don't think it's clear that the verbatim answer Mr. Mathieu would have provided is not all, especially when we're taking the facts in the light most favorable to him at this stage, which is him saying he just didn't understand the language of the questions. He was very anxious. He was online to try to get anxiety medication. He never had the opportunity that morning to be able to receive it. I gather he doesn't say that he told that to anyone in the prison or the immigration authorities, right? Not through the affidavit. Again, in terms of assessing the egregiousness of the actor's conduct, it's not that having been told the facts, you just asserted that they went ahead anyway, right? Because your client doesn't assert that he told them any of those things. He was nervous, that he was waiting for his medication, any of these things. He doesn't assert that he told this to the officials. Correct. He doesn't assert that. And I think that's why the evidential hearing is important. That is, we have at least, I think, a basis for Mr. Mathieu having provided these things. And I think those would be valid questions that we would probably want to enlist it on testimony to say, did you tell someone? Is there someone else we could? Does your client say he told them or doesn't he? Not that I know of because- Okay. So we have a record in which you have to demonstrate that there's a basis for egregious conduct. We can't, on this record, assume that part of that argument is based on his having told the officials, I'm too nervous to proceed. I'm waiting for my medication. I don't understand this. We don't have that in this record. But I think, Your Honor, we do have the reasonable inference that someone who thought they were in trouble for violating corrections regulations would be nervous. And he does say he was nervous. And he just arrived to the prison. The question is whether the conduct of the officials is egregious. So if he's nervous and keeps it to himself or he doesn't have anxiety medication or whatever, keeps it to himself, it doesn't make the conduct of the officials egregious, right? Well, I think the reasonable inference is that the officials knew that this was the case, that this was someone who recently arrived to prison. He was online to try to get anxiety medication. And then he was pulled out for this interview. Do you have a precedent that says that that's an appropriate inference? No, Your Honor. But I think, again, that that would just be when we're looking at it in the light most favorable to Mr. Matute, that is a reasonable inference that one could make. And I think it supplies a basis. So even if Your Honors disagree with me about egregiousness or a basis. OK, well, we'll take the medication out because there's no basis for thinking they would know he was on medication, right? So you're basically saying they wouldn't know he was nervous. Well, Your Honor, he was online to get medication. So and what's the basis for thinking the immigration authorities knew that? Yeah, I don't know that the immigration official would know. But when you say they would infer from the fact that he was in prison, that he was nervous to speak to them. And what else would support an inference that he was nervous and that they shouldn't have spoken to him? What else? You're saying from the immigration officials standpoint, right? Yeah. I think it's the setup having three NIDOC officers standing in the room in this interview. And he said he thought he was compelled to answer questions because he thought it was in trouble. I think because the immigration officer never identified herself, I think a reasonable inference is that Mr. Matute thought he was participating in the normal course of corrections enforcement, of the corrections officer maybe asking him questions about his status in the United States. And certainly, what could happen after that, we're not quite sure. OK. Thank you, Mr. Peng. You've reserved time for rebuttal. So we'll hear from you again. But let's turn to the government. Ms. Groff. Thank you, Your Honors. Good morning. Stephanie Groff for the Attorney General. Your Honors, this court should deny Mr. Matute's petition for review as the agency here properly concluded that his suppression affidavit, even if taken as true, could not support any basis for excluding the department's submitted evidence establishing his Honduran alienage. And this is because Mr. Matute's affidavit did not demonstrate any Fourth or Fifth Amendment violation, much less an egregious violation, such that a suppression hearing to take his warranted. Importantly, I'd like to turn to immigration officers' authorities to interview and ask questions of non-citizens in the United States or those they suspect to be. Under 8 U.S.C. Section 1357A, it states that an immigration officer has broad discretion to interrogate individuals they believe to be non-citizens regarding their rights to be in the United States, as long as that officer is not restraining the freedom of that non-citizen. As all three of your honors have mentioned, Mr. Matute was in state custody. He was not restrained by the DHS officer. He was not infatuated in immigration arrest by the New York prison official. But rather, what we have here is his affidavit that simply states he was in prison. He had recently came. He was nervous. An officer pointed to him, to other individuals, took him to a separate room where he then spoke with a woman, later learned to be ICE, and answered questions. Do you know why the officer picked those three people? We have nothing in the record based specifically on Mr. Matute's suppression affidavit to know why he was picked and the other two individuals were picked. There's actually, Mr. Matute's affidavit does not describe what the other two individuals' alienage were, what their appearance looked like, race. Or did DHS go looking to interview Mr. Matute? So based on the record, it is not clear exactly why DHS picked out Mr. Matute or the other individuals. However, there is evidence. Was he called out by name? Or does the record indicate? Or were three guys just picked out of the line randomly? I believe Mr. Matute's affidavit, which the court looks at, only states that the New York officer pointed to him and two other individuals. So we are unsure of the names of the other two individuals. But the statute you just quoted says that, you know, an immigration officer can interrogate someone by their immigration status. Or it says an alien or somebody believed to be an alien. I mean, does that mean that the officer needs to have some kind of reasonable basis for concluding the person is an alien? There does need to be some sort of basis. But here, if we look into the record, Mr. Matute was in prison for robbery and sentenced to five years. And in the records, his criminal records does indicate that he was potentially born in Honduras. There is, as the court noted, there are various search mechanisms and information that the Department of Homeland Security has. And it is likely that DHS was aware that Mr. Matute was not a U.S. citizen and asked the New York officer to select. It's likely, but you can't tell us whether that's accurate or not. Well, that's not the inquiry we have here. A motion to suppress needs to be supported by an affidavit taken as true to demonstrate an egregious violation of the Constitution. And it is his— Yeah, but I mean, if one of the arguments for why this isn't an egregious violation is because immigration officers have authority to interrogate people believed to be aliens about their immigration status without a warrant, for that argument to work, don't we need to know that the statute applied here because the officer did have a reasonable basis for Mr. Matute was an alien? Well, this court can assume that the statute applied because immigration officials, there's various case law that they act in the best interest that they are following the law. And under this statute, the ICE officer, DHS officer, doesn't necessarily need to say, I am asking and interviewing you based on this statute. Rather, it was a conversation where she asked him questions related to his identity and alienage. And what we have here is his affidavit that states, I didn't fully understand, but I answered to what I thought she was saying. And as this court noted, there was a Spanish translation. He did sign each page. In fact, the testimony that he provided to her— Well, let me ask you about that. Yes, Your Honor. What's not translated is what I'll call the affidavit part of the affidavit. I'm willing to make a statement without anyone else being present. I swear that I will tell the truth, the whole truth, and nothing but the truth. None of that's translated, right? Based on what we see in the evidence. The document. None of that's translated on the document. Correct. Okay. The questions are translated into Spanish. The answers are not translated. So how do we know that he was able to look at the answers? I mean, I gather you don't dispute that the answers are written by the agent, not by Mr. Matisse. Yes, Your Honor. That is clear. So, I mean, you have someone sign something. We can infer he understood the questions, though counsel disputes that based on timing. But, I mean, what's the basis for having somebody sign an affidavit when he can't understand the answers that are recorded on it? Well, that might not have been translated. What's important here is to look to his suppression affidavit and to see if based on that alone, even taken as true, that could support an egregious violation. In his affidavit that he submitted for his suppression motion, he states that he didn't fully understand, but he answered to the best of his ability. And that is what's important to look at here. I understand that some of the answers that are recorded on here are very much in his favor, and that might suggest that there was nothing untoward in this particular incident. But I am concerned about your relying on documents where the person can't read the answers. Well, again, we are not fully sure that he, while it does state in the affidavit DHS submitted that he didn't fully understand, all we have is based on his affidavit, which said that he answered to the best of his ability. And that's what this court needs to look at. There's various case law, specifically in Milan-Hernandez, which reiterated this court's standard to have a hearing and to come to a suppression hearing. Again, in the Supreme Court's decision in INS Lopez-Mendoza, they held that it's only for egregious violations. Yeah, I suppose the question about whether this is reliable evidence of his alienage is a separate question from whether the officers acted egregiously, right? Well, the immigration judge and the BIA have before them the affidavit, and it says he didn't understand all the questions. And so maybe they would decide not to rely too heavily on it, perhaps. But that doesn't mean that the conduct in securing the affidavit was egregious. Yes, Your Honor. But that is, as you noted, a separate inquiry. Evidence in immigration proceedings is whether it is probative and fundamentally fair. And here, while the argument was that it should be suppressed based on a violation of his constitutional rights, there was no evidence that it should be excluded from the record because it's not probative and not fundamentally fair. Can I ask why the affidavit is all that important? So usually, it's not very difficult to prove or establish alienage of an alien in immigration proceedings because DHS has all of these databases, and they can just sort of say, you know, this person doesn't appear to have a legal status. Does proof of his alienage really turn on the admissibility of this affidavit? Based on the record that we have here, taking just the suppression motion, if it weren't for the affidavit, it is likely that the department could have and would have submitted other evidence. But that didn't happen here because the immigration judge held that suppression wasn't warranted and that they could rely on the affidavit. However, Your Honor mentioned previously that Mr. Matute did file an I-589 here. And it's important to remember, in the Supreme Court's decision in INS v. Lopez-Mendoza, they reiterated that the body of a non-citizen, that identity, can never be suppressed. And so there are other examples in this court where DHS does take other searches and does find information. But while we don't have that here, what's important is to just focus on the affidavit. And it does not and could not support any egregious violation. Therefore, the immigration judge— But you're saying regardless of whether there really were egregious violations, still wouldn't get suppression of the fact that he's an alien without legal status? Because that's a fact about him that it wouldn't get suppressed. Is that what you're saying? Correct. But there is case law, I will acknowledge, in this court, such as Rodriguez, where DHS submitted a U visa that a non-citizen applied for. The court in that case held that the government couldn't just rely on this outside evidence based on the severity and egregious misconduct that was potentially there. But here, we don't have any outside egregious conduct. And this affidavit was admitted because Mr. Matute's affidavit could not support any basis. Again, he alleged a Fourth Amendment violation, Fifth Amendment, but there was no unreasonable search or seizure. He was in New York State prison. He was taken to a separate room for questioning. And there's case law in the Supreme Court that discusses prisoners, that in-house, that it was better to take that person to another room for questioning away from the general prison population. That's where one is. So you're saying it's not a separate seizure, that they brought him to a different room within the prison? We would argue that there was no seizure. And even assuming there was, it did not rise to the level of egregiousness, which this court recently held in Medley. What egregiousness, again, is? It's going to shock the conscience. If we have the statute that says the immigration officer is going to ask about immigration status without a warrant, then I guess that means the immigration officer could walk up to him online and just start asking him questions without bringing him to a different room. Yes. In our brief, we did cite to a recent unpublished decision, which Judge Romji was a part of, Ortiz-Whitaker, Diaz-Whitaker. In that case, similar, they had a non-citizen who was in jail pursuant to a criminal arrest in New York State prison. And you had an ICE officer come up to him and ask questions about his alienage. The court there held that, even taking his suppression affidavit as true, there was no violation of his Fourth or Fifth Amendment and no egregious violation. And that has to be that taking him to a different room made it egregious. Because we know that the officer could have just asked him while he's standing around in the prison. And that is what my opposing counsel argues. However, again, we would note that just based on Mr. Matute's affidavit, which we have to go back to, it states he was pointed to, he walked to a separate room, and then was then interviewed. That is far from egregious. Would the state judicial have been allowed to ask him about immigration status? So I was pointing out we have this case law that says sometimes incident to a lawful stop, you know, officers can ask about immigration status. But Mr. Peng was suggesting that because the state can't enforce the immigration laws, they can't even ask about immigration status. What's your view about that? The government would argue that Mr. Peng's phrasing of that is incorrect. While he does cite the U.S. versus Arizona, that it's not illegal to be in the United States, there is case law that state and local officials can inquire about an immigration status. And based on the same statute I noted, 8 U.S.C. 1357A, you may have heard of it, it's 287G agreements. ICE consistently works with local and state officials to help and train those officers to enforce immigration. So states can't enforce immigration laws against federal policy on immigration. But if they are cooperating and the federal government authorizes them to, they are allowed to participate in immigration enforcement, right? And it is appropriate. And here, we would first argue that this New York officer was not acting as an immigration agent by taking Mr. Matute to a separate room. But even if one were to assume that this officer was effectuating an immigration arrest or taking him in, it is... Well, he wasn't effectuating an immigration arrest, but he did help facilitate the questioning of the person, the DHS officer, right? Yes, Your Honor, but that's far from egregious. Egregious is shocking the conscience... How do you respond to the argument that the immigration officer, that no one ever identified this as an immigration inquiry? Yes. So while Mr. Matute's statement does say that the officer never identified herself, and assuming that to be true, the government argues that this is not a egregious violation of the Fourth or Fifth Amendment. There is regulations that when an immigration officer is effectuating an arrest, that they need to identify themselves as an ICE officer. But here, as we noted in our brief, there is no challenge to any regulatory violations by the DHS officer that was waived before the agency. And so arguing that the agent violated that regulation is not before this court. And what, instead, we need to look at is whether it was an egregious violation of the Fourth or Fifth Amendment. And here, we do not have that. And for the following reasons, we ask that you deny the petition for review. Thank you. Thank you very much, Ms. Groff. We'll turn back to Mr. Peng on rebuttal. Thank you, Your Honors. I'd like to pick up right where we left off about the regulatory challenge. So the regulatory challenge was dropped precisely because the officer never identified herself as an immigration officer, such that the regulations don't kick in. And so we don't have a plausible claim on that basis. Second, I think a lot of our discussion today, including what respondent briefed, actually shows the agency's lack of reasoning throughout this entire case. A lot of the nuances that we've been talking about, about prison operation, about the state officer's conduct, about the federal immigration officer's conduct, was never discussed when the agency dismissed this case. So I do think the agency at least has not supplied sufficient reasoning to find that there is no basis for egregious violation. Third, going back to U.S.C. 1357, my friend from the government cited to, the rest of the statute says, yes, an immigration official can question people for immigration status if they believe them to be a non-citizen based on articulable facts. And here, there's nothing to demonstrate there was some independent basis to even start the officer's conduct here of coming to the facility and then questioning Mr. Mathieu. Well, there's no basis for saying that it was some kind of impermissible factor either. So if there's nothing in the record either way, Ms. Groff, I think, was suggesting we have a presumption of regularity about government activity. And so why isn't that just the default rule here, unless there's some reason for thinking that the government was somehow violating its duties and its own regulations? Your Honor, because I think, I know it's a fine line, but I think that does take us to your hypothetical, which is, so then federal immigration officials would be able to stop anyone, anywhere on the street if our reading of the regulation is they don't need to have any articulable basis that this person is an alien of the United States. In Zuniga-Perez, this court said the Fourth Amendment at least protects against random and gratuitous questioning about immigration status. I think on the facture, it's at least random that Mr. Mathieu was questioned. But is it? I mean, why is it? Why do we know that it's random? I mean, we have an officer who comes there. He has records, right? Like he was arrested. His records arrest suggests that he's from Honduras. The government has databases and so on. They pick three specific people. They don't just ask everybody. So why is it, why is the inference that it's random as opposed to specific? Well, one, Your Honor, we're supposed to draw inferences in the light most favorable to Mr. Mathieu. But two, I would just, you know, that's, I mean, you know, you say that, but this is not like a motion to dismiss. The question is whether there is a basis for someone to conclude there was an egregious violation of the Fourth Amendment. It's not exactly the same thing of just like crediting all the allegations. So what is the basis here that says there was an egregious violation? You're saying because we don't know either way, all we know is that the officer picked three people to go see this immigration officer. We should assume that it was arbitrary? I think it's a reasonable inference that when three people were picked out of a general population, that's at the very least random. Why isn't that speculative? It's pure speculation as to why they were pulled out. Well, sure. We don't know how many people are online. We don't know what they look like. We don't know anything. So on a motion to dismiss, we would say that's pure speculation to say that they were pulled out randomly. I don't know that that's a reasonable inference. Fair enough, Your Honor. I think the other component to what Judge Panacea and you and I were discussing is there's kind of a catch-22 that the government has set up, right? Unlike other cases where they do submit 5213, there's a database that's checked. There's something else that gives us another basis for this conduct. Here, the government provided none of it. And I do actually dispute this claim that there were criminal records that showed Mr. Matute was from a different country. I wasn't able to identify anything because there was a certificate of disposition just saying that he was convicted of the state offense. And then there was the repository inquiry. But that doesn't say that Mr. Matute is an alien. So I still don't know what the government could draw on as an independent basis for starting the entire interaction. Finally, Your Honor, I just want to address the reliability point because it was brought up. I think here, if we look at Singh v. Mukasey, it's not so much about whether the evidence could be rebutted and we're able to prove that the evidence that's being adduced is false, but rather about the conduct, the coercion, the duress, that goes into the interview itself, that calls into question the reliability of the report. In Singh, no one checked. I mean, in Singh, we say, in those immigration cases where we have affirmed the denial of suppression motions on the basis that the evidence was nonetheless reliable, the evidence was simple, specific, and objective facts, e.g. whether a person is a foreign citizen or has a passport and valid visa. These facts are not altered by coercive interrogation. A person either is or is not a citizen of a particular country and either does or does not have a visa. So since here we're talking about the simple facts in the affidavit that he is from Honduras and does not have a visa, why doesn't Singh just tell us that this is reliable information, even if the interrogation was coercive? Well, Your Honor, I think this goes to the general idea of the suppression rule. The suppression rule is a prophylactic. It's intended to ensure there is no violation in the manner that Your Honor is describing of limiting government coercion, duress, and placing people in conditions— Yeah, but that's maybe the egregious conduct prong, right? Now, you were just talking a moment ago about reliability. So in Singh, we specifically said the reliability of specific information, such as alienage and the lack of status in the country, is not affected, is not rated unreliable by a coercive interrogation, right? Fair enough, Your Honor. I think, again, the principle of Singh that we were drawing on is just the general coercion and duress that was placed on Mr. Matute. But what evidence is there here that would provide a basis for undermining the credibility or the reliability of the document and your client's reported statements in it? I mean, many of them are favorable to him. So what is the basis for thinking it's not reliable? Well, Your Honor, it is the factors that Singh looked at, including not being advised that he had the right to be accompanied by an attorney. I understand that, but now we're looking at the document. This is a document that gives the age of his daughter, says that he doesn't want to go back to Honduras because he fears gangs. All of this is favorable to him. So what makes it now, what gives us pause as to the reliability of his statement that I'm not legally in the country? Well, Your Honor, I think part of it is because that is the direct document that he's challenging. Because I think what happened was Mr. Matute looked at the result and said, this might not have been what I communicated to the official. For example, the affidavit says it was provided in English and Spanish. Mr. Matute disputed that and said, no, it was only in English, and he was never provided an interpretation for Spanish. And so I think on this early stage, what we're only looking at— But that's just not true, right? I mean, we have the document. You don't dispute that this is not the document. The document does have all the questions in Spanish, right? Correct. Okay. Well, Your Honor, I think just taking the affidavit that Mr. Matute supplied, it was that he was interviewed in English, that the officer jotted down the answers. And so I don't think at this stage we could say 100 percent sure that these were just the verbatim answers that Mr. Matute provided. And so when we're looking at things in the light most favorable to him, I think the reasonable inference is this is not the exact answer that was provided. Your Honor, I do see I'm way over my time. Let me just have one final statement. I was just going to offer— I know there's been this question about the subsequent asylum application. If Your Honors were amenable to me submitting a brief letter brief talking about why the subsequent acknowledgement of aliens shouldn't impinge upon the suppression, I would welcome that. Okay. We'll discuss that. And if we would like that, we'll ask for it. Thank you very much.